UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MELBLEE JONES,

                Plaintiff,

v.                                    Case No.  5:05-cv-52-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

      Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying her application for a period of disability, disability

insurance benefits, and Supplemental Security Income.  (Doc. 1.)  The Commissioner

has answered (Doc. 12), and both parties have filed briefs outlining their respective

positions.[2]  (Docs. 18 & 20.)  For the reasons discussed below, the Court finds that the

Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

      Plaintiff filed an application for a period of disability and disability insurance

benefits on October 10, 2001, alleging an onset of November 23, 2000.[3]  (R. 73.)

Plaintiff's application was denied initially (R. 43) and upon reconsideration.  (R.  47.)

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

[2] In her Memorandum of Law, Plaintiff requested oral argument (Doc. 18), to which the Defendant objected.  (Doc. 19.)  Because the Court the briefs filed in this case did not present any issues for which the Court would require oral argument, Plaintiff's request for oral argument is due to be **DENIED**.

[3] Plaintiff initially alleged an onset date of November 23, 2000, but at the hearing changed that date to July 1, 2001.  (R. 260.)

Plaintiff requested a hearing before an Administrative Law Judge (R. 49) which was held on May 2, 2003.  On June 3, 2003, following the hearing, Administrative Law Judge Albert D. Tutera (the "ALJ") issued a decision unfavorable to Plaintiff.  (R. 21-29.) Plaintiff's request for review of that decision was denied by the Appeals Council on November 16, 2004, rendering the ALJ's decision the final decision of the Commissioner.  (R. 4-6.)  On January 14, 2005, Plaintiff filed the instant appeal to this Court of the Commissioner's final decision.  (Doc. 1.)

## II. <u>ISSUES PRESENTED</u>

Plaintiff contends that the ALJ erred in two respects. First, Plaintiff argues that the ALJ erred by finding Plaintiff's mental impairment "not severe" at step two of the sequential disability analysis. Second, Plaintiff argues that the ALJ erred by relying on the Grids instead of calling a vocational expert to testify about the effects of Plaintiff's mental impairment on the type of work she could perform.

The Commissioner asserts that the ALJ's finding that Plaintiff's mental impairment was not severe is supported by substantial evidence in the record.  The Commissioner also contends that Plaintiff's argument about the use of the Grids is irrelevant because the ALJ found at step four that Plaintiff could perform her past relevant work, making it unnecessary to either call a vocational expert or utilize the Grids.[4]

---

[4] Plaintiff does not challenge the ALJ's determination of Plaintiff's RFC.  Based on the RFC determination, the ALJ found at step four that Plaintiff could perform her past relevant work.  Where the ALJ finds in step four that the Plaintiff can perform her past relevant work, the burden does not shift to the government to show that despite Plaintiff's disability, there is work she can do in the national economy.
As a result, the ALJ never consulted the Grids, nor proceeded to step five, because no burden-shifting occurred, and a vocational expert is not needed at step four.  <u>Schnorr v. Bowen</u>, 816 F.2d 578, 582

(continued…)

## III.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[5]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[6]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[7]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[8]  However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[4](...continued)
(11th Cir. 1986) ("The testimony of a vocational expert is only required to determine whether the claimant's residual functional capacity permits him to do other work after the claimant has met his initial burden of showing he cannot do past work.) (citing Chester v. Bowen, 792 F.2d 129, 131-132 (11th Cir. 1986)). Accordingly, this argument by Plaintiff is irrelevant to the disposition of this case on appeal.

[5] See 42 U.S.C. § 405(g).

[6] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[7] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[8] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[9]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[10]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[11]

The ALJ must follow five steps in evaluating a claim of disability.[12]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[13]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[14]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

---

[9] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[10] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

[11] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[12] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[13] 20 C.F.R. § 404.1520(b).

[14] 20 C.F.R. § 404.1520(c).

disabled.[15]  Fourth, if a claimant's impairments do not prevent her from doing past

relevant work, she is not disabled.[16]  Fifth, if a claimant's impairments (considering her

residual functional capacity ("RFC"), age, education, and past work) prevent her from

doing other work that exists in the national economy, then she is disabled.[17]

      The burden of proof regarding the plaintiff's inability to perform past relevant work

initially lies with the plaintiff.[18]  The burden then temporarily shifts to the Commissioner

to demonstrate that "other work" which the claimant can perform currently exists in the

national economy.[19]  The Commissioner may satisfy this burden by pointing to the Grids

for a conclusive determination that a claimant is disabled or not disabled.[20]

      However, the ALJ should not exclusively rely on the Grids when "the claimant

has a non-exertional impairment which significantly limits his or her basic work skills or

when the claimant cannot perform a full range of employment at the appropriate level of

---

[15] 20 C.F.R. § 404.1520(d).

[16] 20 C.F.R. § 404.1520(e).

[17] 20 C.F.R. § 404.1520(f).

[18] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[19] Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
    In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[20] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

exertion."[21]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[22]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[23]  Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[24]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## IV. SUMMARY OF THE RECORD EVIDENCE

### A.  Personal and Work History

Plaintiff, born on February 20, 1949, was fifty-four at the time of the ALJ's decision.  (R. 261.)  She completed high school through the tenth grade, and in the fifteen years prior to the ALJ's decision, had worked two different jobs.  (R.  79.)  From August of 1986 to July of 1988, and then from August of 1990 to June of 1994,[25] she worked as a school bus driver. (R. 87.)  This job required Plaintiff to sit for five hours a

---

[21] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[22] Walker, 826 F.2d at 1003.

[23] Wolfe, 86 F.3d at 1077-78.

[24] See id.

[25] Plaintiff was physically assaulted in 1994 and stopped working thereafter.

day and to only lift objects less than ten pounds.  (R. 79.)  From May of 1999 to November of 2000, Plaintiff worked as an engineering assistant, routing fiber optic wires along train tracks.  In this job, Plaintiff worked eight hours a day, walking and measuring distances along a road or railroad track.  This job required her to walk, stand, climb, kneel, and crouch, although Plaintiff did not specify the number of hours she spent during her work day in each of those postural positions. This job also required her to lift objects that only weighed under ten pounds.  (R. 89.)

B. **Medical History**

The Court will briefly discuss the medical impairments the ALJ considered in making his assessment of Plaintiff's Residual Functional Capacity ("RFC").  However, because Plaintiff has raised the severity of her mental impairments as the only issue to be decided on this appeal, the Court will focus its discussion on the record evidence pertaining to Plaintiff's mental health.

1. *Physical Impairments*

When Plaintiff filed for disability she claimed an inability to work due to neck injury and pain from spousal abuse, emphysema,[26] and paralysis of her limbs.  (R. 78, 80-83.)  Plaintiff also experienced pain and tingling in her left shoulder, arm, and hand as well as muscle spasms in both shoulders and a burning sensation in her neck and shoulders for which she received ongoing treatment.   (R. 95, 106, 149, 152, 189, 191, 199, 246, 251-253, 254-256.)

---

[26] Plaintiff was diagnosed with COPD or chronic obstructive pulmonary disease.  (R. 137-143,156-164.)

Dr. Duggar's clinical notes in 1997 evidence that Plaintiff complained of neck spurs and had an MRI performed at that time.  Plaintiff complained of neck pain and went to see Dr. Mark J. Cuffe, a neurosurgeon, frequently during the 1996-1997 time period.  (R. 117-119, 128-129, 132, 134-136. )  In November of 1997, Dr. Cuffe, treated Plaintiff's neck problems through an anterior cervical fusion surgery.  (R. 120-127, 130-131, 133, 150-152.)  On February 18, 1998 he approved her return to regular duty at work. (R. 116.)  In a consultative examination performed by Dr. William E. Guy for the Office of Disability Determination, he found that Plaintiff could do daily living activities herself, but could not raise her left arm over her head and used her right hand most of the time.  (R. 152-153.)  He found that her symptoms were suggestive of left-side cervical radiculopathy, a diagnosis also found in later clinical reports. [27] (R. 154-155, 190.)

In January of 2002, Dr. Cortes completed a Medical Verification Form for Plaintiff so that she could participate in the Work and Gain Economic Self-Sufficiency program. He noted that at that time her injury resulted in total and permanent disability, but that she could work with restrictions.[28] (R. 186, 188, 193, 195.)  Two residual functional capacity assessments were completed by agency physicians in 2001 and 2002.  (R. 230-237, 238-245.)  Both physicians found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and sit or stand about six hours in an eight hour workday.  No limitations were found on her ability to push or pull.  (R. 231, 239.) The

[27] In February 2002, Dr. Laubaugh noted Plaintiff experienced loss of motion in her neck and pain upon movement, but did not find any radicular symptoms.  He suggested she see a spine surgeon and consider steroid injections and physical therapy.  (R. 251-253.)

[28] No restrictions were specified by Dr. Cortes on the form.

agency physician in 2002 found that she could frequently climb a ramp or stairs, but should not climb a ladder, rope, or scaffold.  She had occasional limitations on her balance and ability to crouch or crawl, but could frequently kneel or stoop.[29]  (R. 232.)  The agency physician noted that her ability to reach overhead was limited, but found no other manipulative limitations.  (R. 233.)  The agency physician found that Plaintiff should avoid concentrated exposure to hazards and fumes, but found no other environmental limitations.  He noted that his findings were not consistent with the treating physician's assessment of Plaintiff, but were consistent with the consultative examination, and Plaintiff's ability to engage in activities of daily living.  (R. 235-236.)

   *2. Mental Health Impairments*

   Dr. Duggar, Ph.D., treated Plaintiff throughout 1996 and 1997 for depression and anxiety due to family circumstances and pain.  (112-113.)  Plaintiff noted in the form she completed for the Florida Department of Health in November of 2001 that she was in group therapy once a week and individual therapy once a week.  (R. 103.)  In a consultative examination by Dr. Guy for the Office of Disability Determination on December 11, 2001, Dr. Guy noted that Plaintiff had been treated for depression since 1997, though she had never been hospitalized due to illness.  (R. 152.)

   In September of 2001, Plaintiff began treatment and counseling at the Life Management Center for her depression and anxiety as a result of her attempts to leave an abusive marriage.  (R. 181-182.) Plaintiff was diagnosed with Adjustment Disorder

---

[29] In the agency RFC assessment done in 2001, the agency physician noted only occasional limitations in Plaintiff's ability to climb a ladder, rope, or scaffold. He found no manipulative limitations, and noted that Plaintiff should avoid concentrated exposure to fumes due to her COPD.  At that time, he did not note any inconsistencies with the treating physician reports.

with mixed depression/anxiety[30] and found to have a Global Assessment Functioning

("GAF") score of 45.[31]  (R. 176, 202.)  The clinical report on her mental health noted that

she had moderate impairments in occupation/education because she had only

completed the tenth grade, moderate work limitations due to neck injury and surgery,

severe marital/family difficulties due to death threats from her husband, and moderate

interpersonal/social limitations due to isolation from friends.  (R. 177.) It was also noted

that she could use additional training for job skills, and it was recommended that she

attend individual and group therapy to deal with the domestic violence she had

experienced as well as to help her devise a safety plan so that she could leave her

husband.  (R. 178.)

The evaluation of her mental status at that time by the center included a notation

of marked depression and slight or occasional anxiety.  (R. 179.)  No problems in her

orientation, memory, intellectual functioning, or thought content were noted.  However,

slight or occasional problems were found with her insight in acknowledging and

understanding the cause and presence of her psychological problems, as well as slight

impairment of her judgment in managing daily living activities.  (R. 180.)  Slight or

occasional impairments were also noted in her sleep and appetite. *Id.*   Plaintiff

continued receiving counseling at the Life Management Center through November.  (R.

---

[30] Adjustment Disorder with mixed depression and anxiety is defined as "a psychological response to an identifiable stressor or stressors that results in the development of clinically significant emotional or behavioral symptoms," such as anxiety and depression.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 679-80 (4th ed.  2000).

[31] In assessing mental health, psychologists use the Global Assessment Functioning Scale to assess the patient's overall level of psychological, social, and occupational functioning.  A score of 45 places Plaintiff in the middle of the range for "serious symptoms" or "any serious impairment in social, occupation, or school functioning" most likely due to the limitations imposed on her through her abusive marital relationship. *Id.* at 34.

168-173.)  By November 16, 2001, it was noted that she had made average to great improvement in dealing with her depression and anxiety.  (R. 174.)  In Dr. Cortes' clinical notes in December and January of 2001, and in her reconsideration disability report in June of 2002, it was noted that Plaintiff had continued symptoms of depression and anxiety.  (R. 106, 187, 190.)  Dr. Cortes prescribed Remeron and Xanax to control Plaintiff's depression and anxiety.  *Id.*

The Office of Disability Determinations referred Plaintiff to Dr. Weiss, a psychologist, for a mental health evaluation in May 2002.  He found that she was anxious and depressed, but was oriented to time, place and person.  She could name the months of the year, do simple arithmetic, and perform five serial instructions.  Her auditory memory for digits was below average, perhaps due to her anxiety and depression.  With context cues she was able to answer questions about a story read to her and remember two out of four words after a ten minute interval.  Her insight and judgment were marked by impulsivity and she had limited energy for problem solving, but could distinguish right from wrong.  (R. 202.)  She stated that she could eat and dress without assistance, but was not always attentive to her personal hygiene because of her stress and depression.  When home, she does the laundry, cooks, and looks after her grandson.   She was receiving financial help from her son and her first ex-husband because she was unemployed, but pays her bills on time and was found to be able to manage funds effectively.  (R. 202.)

Dr. Steven Wise completed a psychiatric review technique for the agency in November of 2002.  He noted she had affective and anxiety-related disorders (R. 217-

229.)  He noted only mild limitations on her activities of daily living, social functioning, concentration, persistence, or pace, and no episodes of decompensation.  (R. 226.)

Dr. LeVasseur, an agency psychologist, completed a psychiatric review technique form, finding Plaintiff to have an adjustment disorder with depression, but not a severe impairment.  (R. 203- 216.)  He also noted she had mild limitations on her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace.  No episodes of decompensation were present. (R. 213.) Although he made this assessment in November of 2002, he relied on data from Plaintiff's record from November 2001 which included records stating she was able to cook and do light shopping, but could not clean, drive, maintain adequate pace, complete tasks, or attend to her personal hygiene. However, these difficulties were due to physical rather than mental impairments.  This record also noted she was socially appropriate, but had some limitations on her concentration due to pain and irritability.  Dr. LeVasseur concluded based on the file that Plaintiff could remember instructions, complete tasks, work a regular schedule, and maintain socially appropriate behavior.  (R. 215.)           In March 2003, Dr. Julian Giraldo noted that Plaintiff looked depressed and showed lack of interest, motivation, and self-esteem, claiming she would just like to go away and disappear, but did not appear to have suicidal ideations.  He prescribed Wellbutrin for depression.  (R. 157.)

3. *Evidence from Plaintiff's Testimony*

In the hearing held on May 2, 2003 before the ALJ, Plaintiff testified that she still experienced pain in her neck and shoulder which made it difficult for her to hold her head up or do any housework for more than a short  period of time without resting.  (R.

262, 263, 264.)  She testified that she was not taking any prescription medications at the time of the hearing.  (R. 263.)  She could drive, but could not sit for a prolonged period of time.  (R. 264.)  She testified that during the day she tried to avoid using her left side in any activity, but could go grocery shopping herself, or do some exercises for her back.  (R. 265.)  She spent most of the day doing puzzles and watching TV.  *Id.*

She testified that her job as an engineering assistant required her to climb slopes and bend over which would be difficult in her physical condition.  She also did not think she could return to driving a school bus.  (R. 266.)  She testified that she could not lift a gallon of milk (R. 266), nor could she stand or sit for more than fifteen to twenty minutes at a time.  She said she could walk a couple of blocks and that it would take her about twenty to thirty minutes to slowly walk up the street.  (R. 267.)   At the time of the hearing, she had not seen a doctor since February 2002 because she no longer qualified for Medicaid.  Her only relief from pain was lying down, which she did about three times a day.  (R. 268.)

## V. DISCUSSION

 Plaintiff does not argue that the ALJ erred at step four in making his assessment of Plaintiff's RFC.  Instead, Plaintiff contends that the ALJ erred at step two by not finding Plaintiff's mental impairment to be "severe."  While in step two of his analysis the ALJ found that Plaintiff's mental impairment was not so severe as to impair her basic work activities,[32] he took Plaintiff's adjustment disorder and depression into

---

[32] Phillips v. Barnhart, 357 F.3d 1232, 1243 (11th Cir. 2004) ("[T]he ALJ need only determine whether Phillips's nonexertional impairments significantly limit her basic work skills" which "prohibit a claimant from performing a wide range of work at a given level.") (internal quotations omitted); *see also* Foote, 67 F.3d at 1559.

account in step four of his analysis and weighed it appropriately in making his RFC determination.

Under Social Security Ruling 86-15 a nonexertional impairment is defined as "one which is medically determinable and causes a nonexertional limitation of function. . . .[It] may or may not affect a person's capacity to carry out the primary strength requirements of jobs, and [it] may or may not significantly narrow the range of work a person can do."  The Eleventh Circuit in *Brady v. Heckler*[33] established the standard by which an ALJ must measure the severity of an impairment at step two.  An impairment must be found severe at step two for the ALJ to continue with the disability evaluation. In *Brady*, the court held that an "impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."[34]  The Eleventh Circuit clarified this inquiry in *McDaniel v. Bowen* by stating that the ALJ at step two should determine if the claimant's impairment is severe or not severe, but that the burden on the claimant is mild.  Any impairment is considered severe if it has more than a "slight" or "minimal" effect.[35]  "If a claimant succeeds at step two, the ALJ must go on to step three and then, if necessary, to steps four and five."[36]

---

[33] 742 F.2d 914 (11th Cir. 1984.)

[34] McDaniel v. Bowen, 800 F.2d 1026, 1031 (quoting Brady, 724 F.2d at 920).

[35] *Id.*

[36] *Id.* at 1032.

14

In his findings, the ALJ found that "the medical evidence indicates that the claimant has chronic obstructive pulmonary disease (COPD) and is status post cervical fusion in November 1997 with spondylosis.  These impairments are severe within the meaning of the Regulations . . . ." (R. 25.)  Once the ALJ found that the Plaintiff had at least one severe impairment, the ALJ could continue with the sequential evaluation beyond step two. The ALJ is not required to find every impairment satisfied step two in order to proceed with the sequential analysis. Indeed, it would have been error if the ALJ simply had stopped at step two of the sequential analysis and not proceeded with the RFC analysis of Plaintiff's impairments.

The ALJ did just that - and proceeded past step two and considered Plaintiff's nonexertional mental impairments. However, the ALJ found Plaintiff's mental impairments were not severe with regard to Plaintiff's RFC because Plaintiff was able to perform activities of daily living independently, and was "with adequate memory, concentration, and intellectual functioning, [had] no suicidal ideation, and only [had] slightly impaired insight and judgment."  (R. 26.) The ALJ noted that "[t]he claimant was seen at Life Management Center from September 2001 to January 2002 for assistance in dealing with symptoms of depression/anxiety associated with the recent breakup of an abusive marriage . . . . She was assessed with adjustment disorder and participated in group and individual therapy.  Progress notes show that she had improvement by October 2001 and did not participate in additional treatment after January 2002." (R. 26-27.)  Based on this and the other substantial evidence in the record, the ALJ concluded at step four that Plaintiff's mental impairments were not severe enough to

interfere with her ability to do basic work activities.[37]   Accordingly,  the ALJ did not
commit error at step two of the sequential analysis but rather proceeded to consider
Plaintiff's mental impairments as part of the RFC determination at step four. At this
stage of the sequential analysis the ALJ properly concluded based on substantial
evidence that the mental impairments were not severe enough to significantly interfere
with Plaintiff's ability to perform her past relevant work.[38]

## VI.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of
the Commissioner be **AFFIRMED.**

**IN CHAMBERS** in Ocala, Florida, on January 18, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
The Honorable Wm. Terrell Hodges
Senior United States District Judge

Counsel of Record

---

[37] *See* Ramos v. Barnhart, 119 Fed. Appx. 295, 296 (1st Cir. 2005) (holding that substantial evidence supported the finding that the claimant's severe depression "did not significantly affect her ability to perform a full range of jobs at the relevant exertional level"); *see also* Ford v. Chater, No. 95-2188, 1996 U.S. App. LEXIS 11451(10th Cir. May 17, 1996) (holding that Plaintiff's adjustment disorder with depressed mood did not impact her ability to do light, unskilled work.).

[38] Because the ALJ terminated his analysis at step four by finding that the Plaintiff could perform her past relevant work, the burden never shifted to the Commissioner and thus the Commissioner was not required to utilize the Grids or a vocational expert to determine whether there were a significant number of jobs in th national economy that Plaintiff could perform with her impairments. *See,* Schnorr v. Bowen, 816 F. 2d 578, 582 (11th Cir. 1987). Accordingly, Plaintiff's argument that the ALJ erred by failing to utilize a vocational expert is inapposite and, therefore, is due to be rejected summarily.